**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LIBERTY MUTUAL INSURANCE COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **No. 14-1418** |
| **INTEGRATED PRO SERVICES, LLC ET AL.** | **SECTION I** |

<u>**ORDER AND REASONS**</u>

Before the Court are two motions[1] filed by plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), for summary judgment against defendants, Integrated Pro Services, LLC ("IPS"), Gary L. Hess ("Mr. Hess"), and Karla S. Hess ("Mrs. Hess"). Defendants oppose the motions.[2] For the following reasons, such motions are **DENIED**.

**BACKGROUND**

IPS is a construction contractor. In order to submit bids and obtain certain construction projects, IPS was required to provide payment and performance surety bonds which it obtained from Liberty Mutual.[3] On October 25, 2010, IPS and Liberty Mutual entered into a broadly worded "General Agreement of Indemnity" ("the Indemnity Agreement") in which IPS agreed to reimburse Liberty Mutual for any payments, losses, or expenses incurred in connection with such bonds.[4] The Indemnity Agreement also allowed Liberty Mutual to demand collateral security to cover any potential liability that it might face.[5]

---

[1] R. Doc. Nos. 50, 51.
[2] R. Doc. Nos. 61, 62.
[3] *See* R. Doc. No. 51-14, ¶¶ 1-3; R. Doc. No. 61-19, ¶¶ 1-3; R. Doc. No. 62-13, ¶¶ 1-3.
[4] R. Doc. No. 50-3.
[5] R. Doc. No. 50-3, ¶ 2.

At the time the Indemnity Agreement was executed, Mr. and Mrs. Hess had an interest in IPS and they signed the Indemnity Agreement as co-indemnitors.[6] However, shortly after executing the Indemnity Agreement, Mr. and Mrs. Hess sold their entire interest in IPS to a third party. They claim to have had no involvement in IPS's operations since then.[7]

On April 16, 2012, Plaquemines Parish awarded IPS an $11 million contract to construct a levee. In connection with that project, Liberty Mutual issued payment and performance surety bonds.[8] On March 7, 2014, Plaquemines Parish put IPS in default under the contract and on March 28, 2014, IPS was terminated from the project.[9] IPS claims that it was not in default and that the contract was wrongfully terminated. IPS is currently litigating its claims against Plaquemines Parish and a subcontractor in state court.[10] Liberty Mutual subsequently entered into a takeover agreement with Plaquemines Parish in which it agreed to complete the levee construction project.[11]

On June 18, 2014, Liberty Mutual filed the above-captioned lawsuit claiming that it is entitled to indemnity pursuant to the Indemnity Agreement for expenses that it incurred as a result of its payment of multiple claims filed in connection with the payment and performance

---

[6] *See* R. Doc. No. 50-3, at 1, 6. Mr. and Mrs. Hess's co-defendants (John M. Hess, Julie C. Hess, Ryan L. Hess, and Amber M. Hess) are also co-indemnitors pursuant to the Indemnity Agreement. *See* R. Doc. No. 50-3, at 1, 6-7. The Court entered a default judgment against these defendants on November 3, 2014, and they are not involved in the instant motions. *See* R. Doc. No. 22.

[7] *See* R. Doc. No. 62-5, ¶ 7. Mr. Hess's affidavit contains conflicting statements regarding the timing of the sale. *Compare* R. Doc. No. 62-5, ¶ 4 ("November 2010") *with* R. Doc. No. 62-5, ¶ 7 ("October 2010"). However, there appears to be no confusion that the sale took place shortly after Mr. and Mrs. Hess executed the Indemnity Agreement. *See* R. Doc. No. 62, at 2.

[8] R. Doc. No. 50-14, ¶¶ 9, 11-12; R. Doc. No. 51-14, ¶¶ 6, 8-9; R. Doc. No. 61-19, ¶¶ 6, 8-9; R. Doc. No. 62-13, ¶¶ 9, 11-12.

[9] R. Doc. No. 50-14, ¶¶ 14-15; R. Doc. No. 51-14, ¶¶ 11-12; R. Doc. No. 61-19, ¶¶ 11-12; R. Doc. No. 62-13, ¶¶ 14-15.

[10] R. Doc. No. 61-19, ¶¶ 11-12; R. Doc. No. 62-13, ¶¶ 14-15.

[11] R. Doc. No. 50-14, ¶ 23; R. Doc. No. 51-14, ¶ 20; R. Doc. No. 61-19, ¶ 20; R. Doc. No. 62-13, ¶ 23.

surety bonds and its arranging for work to continue on the project.[12] Liberty Mutual has filed motions for summary judgment against IPS as well as Mr. and Mrs. Hess requesting that the Court enter judgment against defendants in the amount of $1,554,836.07 and that the Court require defendants to post $1.5 million worth of collateral security to protect against future losses.[13]

The motions are now ripe for decision. To the extent that any genuine issues of material fact remain to be determined at trial, the parties have agreed to stay and administratively close the above-captioned matter pending resolution of the state court litigation.[14]

## STANDARD OF LAW

### I.     Summary Judgment

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of

---

[12] *See* R. Doc. No. 1.
[13] *See* R. Doc. No. 50-1, at 24; R. Doc. No. 51-1, at 18-19.
[14] R. Doc. No. 76, at 1.

material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.   Louisiana Contract Law

"As in any other contract, . . . it is the terms of the indemnity agreement that govern the obligations of the parties." 6 La. Civ. L. Treatise, Law of Obligations § 11.29 (2d ed.) (citing *Meloy v. Conoco, Inc.*, 504 So. 2d 833 (La. 1987)); *see also Great Am. Ins. Co. v. McElwee Bros., Inc.*, 106 F. App'x 197, 200 (5th Cir. 2004) ("Under Louisiana law, indemnity provisions are construed in accordance with general rules governing contract interpretation."); *Berry v. Orleans Parish Sch. Bd.*, 830 So. 2d 283, 285 (La. 2002) ("In interpreting contracts, including indemnity clauses, we are guided by the general rules contained in articles 2045-2057 of the Louisiana Civil Code.").

"Contracts have the effect of law for the parties and . . . must be performed in good faith." La. Civ. Code. art. 1983. "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tex. Meridian Res. Exp. Inc.*, 180

4

F.3d 664, 668 (5th Cir. 1999) (citing *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998)). "The interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007). "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

"When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Amoco Prod.*, 180 F.3d at 668-69 (quoting *Tex. E. Transmission Corp.*, 145 F.3d at 741) (internal quotation marks omitted). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Id.* at 669. "Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002).

## DISCUSSION

### I.     Liability

The Indemnity Agreement provides that defendants must indemnify Liberty Mutual "from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature" that Liberty Mutual "may sustain or incur . . . by reason of being requested to execute or

procure the execution of any Bond[] or . . . by having executed or procured the execution of any Bond."[15] Liberty Mutual is "entitled to charge for any and all disbursements made by it *in good faith* . . . under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed."[16]

The Indemnity Agreement does not define "good faith," but the Louisiana Procurement Code, La. Rev. Stat. § 39:1551 *et seq.*,[17] states: "Every contract or duty within this Chapter imposes an obligation of good faith in its performance or enforcement. 'Good faith' means honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing." *Id.* § 39:1553(B). Courts have applied this definition to similar indemnity contracts and indemnity disputes related to public works projects. *See Gray Ins. Co. v. Terry*, No. 07-1523, 2014 WL 906481, at *7 (W.D. La. Mar. 6, 2014) (Minaldi, J.) (quoting La. Rev. Stat. § 39:1553(B)), *aff'd*, No. 14-30917, 2015 WL 1223664 (5th Cir. Mar. 18, 2015); *Fid. & Deposit Co. of Md. v. F.D. Shay Contractor, Inc.*, No. 05-197, 2006 WL 149035, at *4 (W.D. La. Jan. 18, 2006) (Trimble, J.) (quoting La. Rev. Stat. § 39:1553(B)).

Liberty Mutual asserts that it has suffered a loss because it paid certain amounts "by reason of having executed the Bonds"[18] and, therefore, it is entitled to indemnity for such

---

[15] R. Doc. No. 50-3, ¶ 2. The Indemnity Agreement also requires defendants to indemnify Liberty Mutual for losses incurred "by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements [that is, surety bonds]; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements." R. Doc. No. 50-3, ¶ 2.

[16] R. Doc. No. 50-3, ¶ 2 (emphasis added).

[17] As Liberty Mutual concedes, *see* R. Doc. No. 51-1, at 10 (quoting La. Rev. Stat. § 39:1553(B)), the Louisiana Procurement Code is applicable here because the obligations at issue relate to a public works project and the expenditure of public funds by Plaquemines Parish. *See* La. Rev. Stat. § 39:1554(B).

[18] R. Doc. No. 51-1, at 9.

payments pursuant to the Indemnity Agreement.[19] Liberty Mutual further contends that defendants' liability can be determined without any consideration of the terms of the surety bonds or its liability thereunder.[20] Liberty Mutual emphasizes that "the Indemnity Agreement contains no provision that incorporates the terms of the Bonds,"[21] and it contends that "IPS'[s] suit against Plaquemines and [a subcontractor] does not impact Liberty Mutual's right to indemnity because IPS'[s] indemnity obligations are triggered when Liberty Mutual incurs loss, not upon a finding of fault."[22]

IPS does not contend that the Indemnity Agreement is invalid or unenforceable against it, but IPS asserts that Liberty Mutual has not demonstrated that it is entitled to indemnity for amounts that, according to IPS, Liberty Mutual was not required to pay.[23] IPS asserts that Liberty Mutual's argument "wholly ignores the underlying obligation creating any duty under the [Indemnity Agreement], that is[,] the terms and conditions of the Payment and Performance Bonds that trigger any liability of Liberty Mutual and the principal, IPS."[24] As stated, IPS claims that it was not in default, the contract was wrongfully terminated, and Liberty Mutual was not required to pay anything on the claims against the surety bonds.[25]

IPS has submitted an internal email between Liberty Mutual employees, dated October 14, 2013, that discusses the levee construction project.[26] The email states that Plaquemines

---

[19] *E.g.*, R. Doc. No. 68, at 4-5.

[20] R. Doc. No. 68, at 2-3.

[21] R. Doc. No. 68, at 3.

[22] R. Doc. No. 68, at 5.

[23] *See* R. Doc. No. 61, at 11 ("To the extent that Liberty Mutual is seeking some declaration that the [Indemnity Agreement] is valid and enforceable as to IPS, that is something that is likely not contested.").

[24] R. Doc. No. 61, at 1-2.

[25] R. Doc. No. 61-19, ¶¶ 11-12; R. Doc. No. 62-13, ¶¶ 14-15; *see also* R. Doc. No. 61-19, ¶ 16 ("IPS denies that Plaintiff rightfully incurred costs in connection with Bond Claims . . . .").

[26] R. Doc. No. 61-16.

Parish advised Liberty Mutual that it "is going to terminate the contract today"; "that the job is virtually subcontracted out"; that the subcontractor "is doing a good job and . . . will remain on the job and complete it for the same price"; and that "this is good for [Liberty Mutual]."[27] IPS contends that it was not aware of this communication until the email was produced during this litigation.[28] This email, dated over five months before IPS was actually terminated from its contract by Plaquemines Parish, may raise an inference that Liberty Mutual did not act in good faith because it was not conducting itself with "honesty in fact in the conduct or transaction concerned" and/or because it did not "observ[e] . . . reasonable commercial standards of fair dealing." La. Rev. Stat. § 39:1553(B).

Furthermore, the Court disagrees with Liberty Mutual's position that issues related to the surety bonds are wholly irrelevant to this case. If IPS is correct that Liberty Mutual's surety obligations were not actually triggered and that Liberty Mutual was not required to have paid any amounts under the surety bonds, such fact would *not* be fatal to Liberty Mutual's claims for indemnity.[29] The Indemnity Agreement does not require Liberty Mutual to prove its liability under the surety bonds as a condition precedent to its claim for indemnity. However, the legitimacy of the claims against the surety bonds *is* relevant to the issue of Liberty Mutual's good faith and whether it made any payments "under the belief that it is, or was, or might be liable."[30] Disputed issues of fact related to the surety bonds will be examined and, hopefully,

---

[27] R. Doc. No. 61-16, at 1.

[28] *See* R. Doc. No. 61, at 18.

[29] As stated, pursuant to the Indemnity Agreement, Liberty Mutual is "entitled to charge for any and all disbursements made by it *in good faith* in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, *whether or not such liability, necessity, or expediency existed*." R. Doc. No. 50-3, ¶ 2 (emphasis added).

[30] R. Doc. No. 50-3, ¶ 2.

resolved during the state court litigation and those issues are material to the case before this Court.[31] Accordingly, the Court finds that genuine issues of material fact preclude summary judgment based on the present record.

## II.   Damages

Liberty Mutual asserts that it has incurred $1,554,836.07 in net losses, resulting from $3,141,480.11 in claim expenses and $1,586,644.04 in "[p]ayments received and credited toward the Bond claims."[32] Liberty Mutual also demands $1.5 million in additional collateral security to protect against potential future losses.[33]

As described above, because Liberty Mutual is only entitled to indemnity for payments it made and losses it incurred *in good faith*, the Court cannot determine on the present record the extent to which Liberty Mutual is to be indemnified. Furthermore, as noted by IPS, "Liberty Mutual's motion and supporting Affidavit do not identify what payments may currently be pending from [Plaquemines Parish] or whether Liberty Mutual has submitted any change orders or requests for adjustment of the contract price."[34] Because Liberty Mutual has assumed responsibility for the project and it is being paid to complete it,[35] under the circumstances of this

---

[31] The Court notes that in *Gray*, the surety company/indemnitee filed a motion for summary judgment while the underlying bond claims were still being litigated, and the court denied such motion "as premature." 2014 WL 906481, at *2. "As the defendants at the time took the position that there was an unsettled issue in the case as to whether the claims paid by [the surety company/indemnitee] had been *properly* paid, the court found that a final disposition on th[e] matter was not appropriate at the time." *Id.* The court stayed and administratively closed the case until the resolution of the litigation related to the underlying claims. *Id.*

[32] R. Doc. No. 51-1, at 12; *see also* R. Doc. No. 51-9 (spreadsheet and related evidence).

[33] R. Doc. No. 51-1, at 14-17. The Court notes that, by operation of the Indemnity Agreement, IPS assigned to Liberty Mutual IPS's interest in the contract with Plaquemines Parish "as collateral security." *See* R. Doc. No. 50-3, ¶ 3.

[34] R. Doc. No. 61, at 24.

[35] *See* R. Doc. No. 50-14, ¶ 23; R. Doc. No. 51-14, ¶ 20; R. Doc. No. 61-19, ¶ 20; R. Doc. No. 62-13, ¶ 23.

case, the full extent of Liberty Mutual's losses, if any, remain uncertain.[36] Accordingly, the Court finds that genuine issues of material fact preclude summary judgment with respect to the issues of damages and collateral security.

### III.   Mr. and Mrs. Hess

The above-described issues that are raised in the motion for summary judgment as to IPS are equally relevant with respect to Liberty Mutual's claims against Mr. and Mrs. Hess. However, Liberty Mutual also contends that it is entitled to summary judgment with respect to Mr. and Mrs. Hess's assertion that "they have no liability under the Indemnity Agreement because co-indemnitor Ryan Hess informed Liberty Mutual that Gary Hess transferred his [that is, Gary Hess's] ownership interest in IPS prior to the execution of the Bonds, thereby[] effectively terminating [Mr. and Mrs. Hess's] liability."[37] Liberty Mutual further asserts that Mr. and Mrs. Hess did not terminate their indemnity obligations pursuant to paragraph 19 of the Indemnity Agreement,[38] which requires written notice.[39]

Liberty Mutual's argument proceeds from the faulty premise that paragraph 19 is the sole means of terminating an indemnitor's obligation. To be sure, an indemnitor who unilaterally

---

[36] *See* R. Doc. No. 77-1, at 1. Liberty Mutual asserts that uncertainty regarding the *full* extent of its damages does not preclude summary judgment as to the *present* extent of its damages because the Court can "reserve the surety's right to recover indemnity for its additional losses" that are incurred in the future. R. Doc. No. 68, at 9. However, Liberty Mutual will also receive additional payments pursuant to the takeover agreement. Without a final accounting, the Court cannot conclude that Liberty Mutual will lose any money at all, and nothing in the Indemnity Agreement gives Liberty Mutual the right to recover a windfall at defendants' expense. Moreover, the Court notes that according to Liberty Mutual's motion for a bifurcated trial on the issues of liability and collateral security, delaying trial on such issues until after the resolution of the state court litigation "will avoid prejudice to Liberty Mutual and be more convenient and economical for the Court, the parties and the witnesses." R. Doc. No. 74, at 1-2 (citing Fed. R. Civ. P. 42(b)). For all of these reasons, the Court finds that it would be inappropriate to grant summary judgment at this time with respect to any amount of damages or collateral security.
[37] R. Doc. No. 50-1, at 7.
[38] R. Doc. No. 50-1, at 7-12.
[39] R. Doc. No. 50-3, ¶ 19.

seeks to terminate his obligations must do so pursuant to paragraph 19. However, paragraph 16 of the Indemnity Agreement states, "The Indemnitors and Principals shall continue to remain bound under the terms of the [Indemnity] Agreement, Other [surety] Agreements, and any other agreements containing indemnity obligations, even though *the Surety [that is, Liberty Mutual] may from time to time heretofore or hereafter*, with or without notice to or knowledge of the Indemnitors and Principals, *accept, release, or reduce any indemnity obligations or collateral of current or future Indemnitors and Principals for any reason*."[40] Clearly, Liberty Mutual has the right to terminate any indemnitor's obligation at any time "for any reason,"[41] and there are genuine issues of material fact with respect to whether Liberty Mutual did so.

According to the affidavit by Ryan Hess, Liberty Mutual was advised no later than March 31, 2011, that Mr. and Mrs. Hess were no longer involved with IPS and that they would no longer serve as guarantors of any bonds.[42] Liberty Mutual allegedly agreed to release Mr. and Mrs. Hess from their indemnity obligations.[43] Although a September 29, 2011 email from Brian Smith, Liberty Mutual's employee, would seem to contradict that assertion,[44] a Liberty Mutual internal document contains a note by Brian Smith dated February 9, 2012, which states that "[o]ur current indemnity package includes the full PI of John Hess, Ryan Hess, and their spouses."[45] Mr. and Mrs. Hess are conspicuously omitted. Accordingly, the Court finds that there

---

[40] R. Doc. No. 50-3, ¶ 16 (emphasis added).
[41] R. Doc. No. 50-3, ¶ 16.
[42] *See* R. Doc. No. 62-1, ¶¶ 7-8.
[43] *See* R. Doc. No. 62-1, ¶¶ 7-8.
[44] R. Doc. No. 62-2, at 1 ("As a reminder, [Mr. Hess] needs to notify Liberty in writing that he wants to terminate his personal Indemnity.").
[45] R. Doc. No. 62-7, at 6.

is a genuine issue of material fact as to whether Liberty Mutual released Mr. and Mrs. Hess from any indemnity obligation.[46]

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendants' motions[47] for leave to file supplemental memoranda are **GRANTED**.

**IT IS FURTHER ORDERED** that Liberty Mutual's motions[48] for summary judgment are **DENIED**.

**IT IS FURTHER ORDERED** that the above-captioned matter is hereby **STAYED** and **ADMINISTRATIVELY CLOSED**. Any party may file a written motion to re-open the above-captioned matter within 30 days following resolution of the state court litigation.

New Orleans, Louisiana, June 9, 2015.

 

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[46] Because genuine issues of material fact preclude summary judgment, the Court need not address at this time Mr. and Mrs. Hess's alternative arguments regarding a purported oral modification of the written notice requirement, R. Doc. No. 62, at 11-14, or regarding their claim of estoppel against Liberty Mutual, R. Doc. No. 62, at 16-22.
[47] R. Doc. Nos. 77, 78.
[48] R. Doc. Nos. 50, 51.